**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **HOWARD VOGEL,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:12-CV-00990 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **CA, INC.,** | : | |
| **Defendant.** | : | **September 8, 2014** |

**MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT [Dkt. #32]**

### I.     Introduction

The Plaintiff, Howard Vogel ("Vogel"), brings this employment discrimination action against Defendant CA, Inc. ("CA") for alleged race and national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, *et seq.*, as well as for retaliation pursuant to both statutes.  Currently pending before the Court is the Defendant's Motion for Summary Judgment.  For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED.

### II.     Factual Background

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed unless otherwise noted.  The Court notes that the Plaintiff has admitted to many of these facts even though they are not fully supported by the record to which the Defendant has cited in its Local Rule 56(a)1

Statement.  "Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout th[e] litigation."  *Crawford v. Franklin Credit Mgmt. Corp.*, 13-2514, --- F.3d --- , 2014 WL 3377175 (2d Cir. July 11, 2014) (citation omitted).  Likewise, admissions in a counter-statement of material fact constitute judicial admissions to which a party is bound.  *Setevage v. Dep't of Homeland Sec.*, 539 Fed. Appx. 11, 13 (2d Cir. 2013).  Moreover, where the Plaintiff has failed to deny an asserted fact that is supported by record evidence, that fact is deemed to be admitted.[1]  D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party.");  *SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004);  *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).

CA is a multi-national corporation that designs, develops, and licenses computer software products and services to support such products.  [Dkt. 36, CA 56(a)1 Stmt. ¶1].  Jack Kudale, a Senior Vice President at CA of Indian national origin, hired Mr. Vogel in October 2005.  [*Id.* at ¶3].  Vogel's employment was at all times at-will.  [*Id.* at ¶4].  Vogel reported to Mr. Kudale for his first two years of employment with CA in various roles in the sales and marketing departments and viewed him as a mentor.  [*Id.* at ¶¶5, 6].

---

[1] The Plaintiff has not posited any response at all to Defendant's asserted facts 13, 18 and 19, and has responded that he has "no knowledge" as to Defendant's asserted facts 36, 43, 44, 61, 62, 71, and 75 – 78.  These facts, where supported by the evidence, are thus admitted.

In early 2008, at Mr. Kudale's suggestion, Vogel transferred laterally into a project-based role in the Company's Alliances Division.  [*Id.* at ¶7].  When that project ended in late 2009, Vogel accepted a role as an Account Director in CA's newly created India Service Provider team in October 2009, again at Mr. Kudale's suggestion.  [*Id.* at ¶¶8-9].  The India Service Provider team was a sales team situated in the Direct Sales cost center of CA created by Dennis Kozak, Senior Vice President, Global Service Providers, to more effectively collaborate with the six largest India-based software service providers with which CA partnered to sell software  [*Id.* at ¶¶10-13].  Dennis Kozak initially managed the team, which he staffed by pairing four U.S.-based Account Directors with India-based CA counterparts and matching a U.S.-based team and an India-based team to work with each of the India service providers.[2]  [*Id.* at ¶14].  Vogel and his India counterparts were assigned to work with the Tech Mahindra/Mahindra Satyam, or TM/MS company.  [*Id.* at ¶15].  CA's three other U.S.-based Account Directors were Blain Johnson, Robert DeSilva, and Harvey Brill, who are each white and non-Indian.  [*Id.* at ¶16].  Rounding out the team was a junior Account Manager, Atul Salmi, who is Indian, and who worked with Harvey Brill on his accounts.  [*Id.* at ¶17].

The primary responsibilities of the Account Directors who comprised the India Service Provider team were to: (1) enter into transactions where the service provider facilitates a customer purchase of a CA product for the customer's own internal use ("selling with"); (2) sell to the service provider for the service

---

[2] The Court notes that this assertion is not supported by the evidence to which the Defendant has cited, but also that the Plaintiff has admitted this fact.

provider's own internal use ("selling to"); and (3) enter into transactions where the service provider purchases, implements, and manages the CA product as part of a unique managed service or solution provided to one or more of the service provider's clients ("selling through").  [*Id.* at ¶18].  Perlman further testified that, to "build a pipeline," account directors would identify opportunities where a partner could add value, manage relationships between the team and the partner, formulate joint business plans, and run marketing events.  [*Id.* at ¶19; dkt. 33-3, Perlman Depo. 43:8 – 44:3].  Building a pipeline also involved building and maintaining relationships with key executives and decision-makers, identifying new and expanded sales opportunities, and then ultimately negotiating and closing those sales opportunities.  [*Id.* at ¶20].

The Account Director had a sales quota and could qualify for incentive compensation (sales commissions) paid on closed sales.  [Dkt. 36, CA 56(a)1 Stmt. ¶21].  On October 1, 2009, when he joined the India Service Provider team, Vogel received his Incentive Compensation Schedule as an Account Director, for the period of April 1, 2009 through March 31, 2010, the remainder of CA's fiscal year 2010, which set forth Vogel's sales quota for the remainder of this term.  [*Id.* at ¶¶22-23].  This document set Vogel's sales quota at $3 million for the six month period.  [*Id.* at ¶24].

In January 2010 Steven Perlman took over full-time management of the India Service Provider team.  [*Id.* at ¶25].  Both parties agree that, in the same month, Vogel told Perlman that the Account Director role was not what he had anticipated when he initially took it.  Perlman told Vogel to take some time to

consider whether he wanted to continue in the Account Director role or whether

he wanted to transfer to another position; Vogel did so and reported back to

Perlman that he wanted to continue in the Account Director role.[3]  [*Id.* at ¶¶26-27].

One month later, in February 2010, Vogel sent an email complaint to CA's

Human Resources internet-based hotline.  [*Id.* at ¶28].  In that complaint, Vogel

---

[3] While both parties agree to the veracity of these facts, the Court notes that the transcript of Vogel's deposition, to which CA has cited, does not comport with the admitted facts and instead reads as follows:

> Q:  … So if you started working on this team in October or November of 2009, the conversation you described with Dennis [Kozak] and the conversation you described with Steve [Perlman] happened right around that same time period.  Is that fair to say?
> A:  Yes.
> Q:  Okay.  So you had a conversation with Dennis before taking the job where he told you – he described the job one way.  Is that your testimony?
> A:  Yes.
> Q:  And then you had a conversation with Steve Perlman when you found out he was going to be your supervisor where he described the job another way.  Is that correct?
> A:   Correct.
> Q:  How did you respond to Steve Perlman's description of the job?
> A:  I told Steve that that was not the position that I talked to Dennis about and I just wanted some time to contemplate that before I made the decision to accept it.
> Q:  Okay.  And how did Steve respond?
> A:  He was fine with it.
> Q:  Okay.  And so did you take the time to contemplate this job as Steve described it?
> A:  I did.
> Q:  And what decision did you come to?
> A:  That I would take the position and build out these programs as defined.
> Q:  Okay.  When did you make that decision?
> A:  I think I talked to Steve on like a Thursday or a Friday, and I took the weekend to decide.  And then I called him back that Monday or Tuesday.
> Q:  Okay.  So we're still talking late 2009.  Correct?
> A:  Yes.

[Dkt. 33-2, Vogel Depo. 49:2 – 50:14].

described his concern that the "strategic part of [his] role was disappearing for a straight sales role," which was not the role he had initially discussed with Perlman, and that Perlman had shifted some of the strategic role to the team members based in India.  [*Id.* at ¶¶28-29].  A human resources representative contacted Perlman to investigate the Plaintiff's complaint, and Perlman told the representative that he would follow up with Vogel to ensure that Vogel was clear as to his job responsibilities.  [*Id.* at ¶30].

The parties do not, however, agree on the scope of Vogel's complaint. Defendant CA has submitted Steven Perlman's deposition testimony, during which Perlman testified that the conversation he had with the human resources representative related solely to Vogel's complaint that he was confused as to what his role was and wanted more clarity as to his responsibilities on the India team, and that Perlman further testified that he did not remember ever learning from anyone that Vogel had complained that Perlman's decisions were based on race or that he had commented that Vogel did not "work or play well with the guys in India."  [*Id.* at ¶¶30-32; Dkt. 33-3 Perlman Depo. 47:22 – 48:3].

The Plaintiff, however, maintains that the shift in his role was due to race. Vogel testified that he told the Human Resources professional who contacted him that his "responsibilities were being stripped from [him]" and that he was not confused about his job responsibilities.  [Dkt. 39-2, Vogel 56(a)2 Stmnt. ¶29]. When asked at his deposition whether he spoke with the Human Resources representative about gathering an understanding of what his job responsibilities would be moving forward, Vogel responded "[n]o.  At that time, I believe I had a

**6**

clear understanding of what I was hired to do." [*Id.*].  Vogel also testified that he complained to Human Resources that "one of the determining factors [of his role on the team] was based on the fact that [he] was not Indian."  [*Id.*; Dkt. 39-2 Vogel Depo. 85:1-11].  The Plaintiff has submitted an email from Human Resources representative Robin Grady to another CA employee, memorializing the notes from her conversations with Vogel and Perlman regarding Vogel's complaint. Grady noted that Vogel submitted his complaint and that it was assigned to her, and that his complaint stated as follows:

> I believe that one of the factors in the definition of my role within CA is being decided based on race. I am currently the AD for two Indian partners. It has been discussed that the Indian partners would rather deal with people of Indian decent [sic]. We recently built out an organization in India to work with these same partners. The partners have expressed no issues with my communication or performance and have asked to continue to work with me for North/South America sales. Now a portion of my responsibilities are being moved to CA Indian resources in India. I am currently the only white resource in my role with the Indian partners in the US or India that is not senior management.

[Dkt. 39-2, Vogel 56(a)2 Stmnt. ¶29; Dkt. 39-4, Grady email, p.24/66].  Grady further noted that she spoke with Mr. Perlman after having spoken to the Plaintiff, and noted as follows:

> Steve was also upset by Howard's accusation that decisions were being made based on race. Yes, the Indian partners live in India. Howard is the only white person on the team and happens to live in the US. Steve is unclear about where this perception is coming from.

[Dkt. 39-2, Vogel 56(a)2 Stmnt. ¶29; Dkt. 39-4, Grady email, pp.24-25/66].

Both parties agree that Perlman immediately spoke with Vogel after speaking with the Human Resources representative and "address[ed] his concerns." [Dkt. 36, CA 56(a)1 Stmt. ¶34]. Vogel testified that this conversation focused on Perlman "disclosing on the community calls as we discussed that he would be saying that all the strategic responsibility would come back to me." [Dkt. 39-3 Vogel Depo. 102:5-9]. Vogel then reported to the human resources representative that his conversation with Perlman went well and that he considered the issue "closed." [Dkt. 36, CA 56(a)1 Stmt. ¶35]. None of the other Account Directors complained about a lack of clarity in their roles or about any racial bias. [Dkt. 36, CA 56(a)1 Stmt. ¶36].

As of March 31, 2010, the end of CA's fiscal year and after six months in the Account Director role, Vogel had not made any commissionable sales against his $3 million sales quota. [*Id.* at ¶37]. In April 2010 Perlman prepared Vogel's performance evaluation for fiscal year 2010, in which Perlman rated Vogel's overall performance as "Partially Achieved Expected Results." [*Id.* at ¶38]. Perlman memorialized his concern that Vogel had failed to close any business with TM/MS in fiscal year 2010 as follows:

> [While Vogel demonstrated] excellent approach to build a long-term sustainable business model … short-term success need [sic] to be realized. Sales is success driven and is a numbers game. The ability to close business on a regular basis is critical to be ultimately successful in sales and there has been virtually no business driven with either Tech Mahindra or Mahindra Satyam.

[*Id.* at ¶¶39-40; dkt. 33-5, Eval. p.4].  Perlman further noted that Vogel would not be successful in his sales job if he did not start driving business with TM/MS and start demonstrating the ability to engage his partners by identifying opportunities and "assist[ing] in the nurturing of the sales process from inception to closure." [*Id.* at ¶41].  Perlman concluded that Vogel needed to create and drive pipeline opportunities immediately.  [*Id.* at ¶42].

In April 2010 Perlman - with the Plaintiff's input - set Vogel's sales quota for fiscal year 2011 at $5 million.[4]  [*Id.* at ¶45].  This quota was $1 million less than Vogel's quota from fiscal year 2010, which was $3 million for the six month time period between October 2009 and March 2010, or $6 million annualized.  [*Id.*].  Vogel had suggested that his fiscal year 2011 sales quota be set at $4 million, a $1 million increase from his six month quota in fiscal year 2010.  [*Id.* at ¶46].

In addition to the annual performance evaluation conducted in April, Perlman regularly counseled Vogel about his sales goals, which typically involved a discussion of Plaintiff's sales pipeline, which is a common sales metaphor to visualize sales prospects.  [*Id.* at ¶¶47-48].  New sales opportunities are put into the pipeline and work their way through until they materialize into purchase orders, or drop out along the way as disqualified leads.  [*Id.* at ¶48].  Generally, Account Directors must have at least three times their sales quota in their pipeline in order to stay on track to meet their quota.  [*Id.* at ¶49].  The

---

[4] In setting this quota, Perlman testified that he "took input from Howard, I took input from my overall quota, I took in my discretion based on what I knew of what he was doing or ability to know what he was doing."  [Dkt. 33-3, Perlman Depo. 50:6-16].

parties disagree as to whether Vogel's pipeline was sufficiently developed to be on track to meet his quota.  Perlman, who has submitted an affidavit in support of summary judgment, attests that Vogel's pipeline did not contain three times his sales quota and that he offered Vogel help, made suggestions about actions he could take, and regularly discussed options with him about growing his pipeline. [*Id.* at ¶49; Dkt. 35, Perlman Aff. ¶9].  Vogel, on the other hand, denies that his pipeline numbers were not tracking.  In support, he cites to his deposition testimony that, at some point in time not distinguished in the transcript, "the pipeline was way up above my quota, many times my quota with [a particular deal].  Once that deal disintegrated, then the pipeline went down."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶49].  Vogel also denies that Perlman offered him help, instead recounting that he had

> asked [Perlman] on several occasions to help me.  On several of the occasions, he just made fun of me.  He would tell me what a terrible job I was doing. . . . And I explained to him that that is not helpful.  If there are things that I am not doing in relation to selling these deals, I'm happy to do that.  And he would laugh at me.  He would tell me that I should call the other members of our team to find out what they were doing.  One time he said, you're a professional; you figure it out.  His demeanor was non-helpful.  It was actually more hurtful.  It was very hostile.

[Dkt. 39-2, P's 56(a)2 Stmt. ¶49; Dkt. 39-3, Vogel Depo. 149:14 – 150:5].

The parties agree that Perlman held weekly calls with Vogel and the rest of the TM/MS team in India, during some of which Perlman heard Vogel speak in a dismissive, condescending, and often combative manner to the team members in India.  [Dkt. 36, CA 56(a)1 Stmt. ¶50].  Vogel admitted that interactions with the

**10**

TM/MS team in India were contentious.  He testified that  "some of the meetings ended in heated discussions" in which "all four participants were engaged in heated discussion."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶50].  The parties agree that, as part of his management responsibilities, Perlman counseled Vogel that he needed to interact with and work in a more professional manner with the team in India. [Dkt. 36, CA 56(a)1 Stmt. ¶51].

By July 2010 Vogel still had not closed any sales that counted toward his quota.  [Dkt. 36, CA 56(a)1 Stmt. ¶52].  As a result, and after meeting with Vogel, on July 29, 2010, Perlman put Vogel on a thirty day Pre-Performance Improvement Plan ("Pre-PIP") to provide him with written direction to detail the expectations of and set performance metrics for Vogel's role.   [Dkt. 36, CA 56(a)1 Stmt. ¶¶53-54].  Perlman notified Vogel that he would be monitoring Vogel's performance over the course of the following thirty days and, if Vogel had not achieved the goals set forth in the Pre-PIP, he would be put on a formal Performance Improvement Plan.  [*Id.* at ¶54].  Perlman sent the Pre-PIP document via email to Vogel on July 29, 2010 and assured Plaintiff that he was "[h]ere as a resource for you to help you achieve the above requirements.  Please let me know how I can be of assistance to you."  [*Id.* at ¶55].  The Plaintiff contends that Perlman understood this Pre-PIP to be unachievable, but has failed to support this assertion with reliable supporting evidence in the record.  Plaintiff has cited to his own deposition testimony as follows:

> Vogel:  I asked about these things.  And when I looked through
> the quotas and told him that, you know, even though we had
> some pipeline and this pipeline comes after the Meteorcomm

> deal was removed from the table, because the pipeline was
> way up above my quota, many times my quota with that deal.
> Once that deal disintegrated, then the pipeline went down.
> That's where this number comes from.  And I brought all that
> up to her.  They told me it was irrelevant.  That this is the
> performance plan.  I told them I didn't think that some of the
> things in here were achievable.  And they said they
> understood that this is not achievable, but it's based on best
> effort and Steve will be the determining factor of whether
> you've given enough effort to do this particular job.

[Dkt. 39-2, P's 56(a)2 stmnt. ¶55; Dkt. 39-3, Vogel Depo. 143:3-17, ecf. P.35].  It is

entirely unclear from the deposition testimony, however, to whom Vogel was

speaking or at what point in his employment with the India Services team, as

Vogel has not provided the Court with the context of this testimony.  It also is

unclear whether Vogel was involved in a conversation regarding the Pre-PIP or a

subsequent Performance Improvement Plan.

The parties agree that Perlman met with Vogel on August 27, 2010 to

discuss his performance against the Pre-PIP requirements.  [Dkt. 36, CA 56(a)1

Stmt. ¶56].  Perlman affirms that Vogel had made no progress against the Pre-PIP

goals and offered no explanation for his lack of progress.  [*Id.*].  Vogel, on the

other hand, denies that he offered no explanation (but admits that he made no

progress) and credits the tentative business nature of the client and the lack of

prior relationship with CA as the reasons for his low sales, concerns he raised

with Perlman in an email sent on July 30, 2010.  [Dkt. 39-2, P's 56(a)2 Stmt. ¶55].

Vogel testified that his pipeline was "way up above" his quota at some point but

when a major deal "disintegrated, then the pipeline went down."  [*Id.*].  It is

unclear from this testimony, however, when the deal disintegrated or at what

point the pipeline was well above Vogel's quota.  The parties agree that Perlman

chose not to put Vogel on a Performance Improvement Plan ("PIP") immediately, but rather allowed him two extra months to continue to work on the Pre-PIP goals.  [Dkt. 36, CA 56(a)1 Stmt. ¶57].

As of September 2010, Vogel was still underperforming both in absolute and on comparative terms. Unlike the other Caucasian Account Directors, Vogel had not made a single sale that counted toward his quota.  [Dkt. 36, CA 56(a)1 Stmt. ¶58; Dkt. 39-2, P's 56(a)2 Stmt. ¶58].  Vogel testified, though, that "there was software sold that I was a part of that was never credited to me;" however, Plaintiff concedes that these sales "were not credited to me based on their requirement that they weren't high enough."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶58].  As of September 17, 2010, Vogel had closed zero sales attributable to his quota, Mr. Johnson had closed over $2.5 million in sales toward his quota, Mr. DeSilva had closed $271,000 in sales, and Mr. Brill and Mr. Sahni had each closed over $575,000 in sales.  [Dkt. 36, CA 56(a)1 Stmt. ¶59].  Further, Vogel's pipeline was $1,707,000, a fraction of the $15 million generally necessary to meet his $5 million quota.  [*Id*. at ¶60].  A month later, in October 2010, Vogel's sales remained at zero while Johnson's, DeSilva's, Brill's, and Sahni's each increased; Johnson's to $3.3 million, DeSilva's to almost $400,000, and Brill's and Sahni's to a bit over $1 million.  [*Id*. at ¶61].

As a consequence, on October 12, 2010 Perlman placed Vogel on a sixty-day Performance Improvement Plan after meeting with him in person to discuss it.  [Dkt. 36, CA 56(a)1 Stmt. ¶¶63, 65; dkt. 33-8, PIP p.2/5].  The parties agree that the purpose of a PIP is to clearly detail job responsibilities and expectations with

**13**

the hope that employees use the information to improve and succeed.  [Dkt. 36, CA 56(a)1 Stmt. ¶64].  The PIP addressed Vogel's continued failure to meet the performance requirements of his job and set forth performance requirements and goals that Vogel was expected to meet over the next sixty days.  [*Id.* at ¶66].  The PIP focused on three performance requirements: Overall Revenue Attainment; Sales Pipeline; and Sales Activity, and required that Vogel achieve a pro-rated portion (1/12th) of his quota for each month of the PIP, add at least eight new opportunities to his pipeline, and increase his sale activity.  [*Id.* at ¶67].  The PIP noted that Vogel "continue[d] to demonstrate a reluctance to meet with customers, partners or CA Technologies direct sales team members."  [*Id.* at ¶68].  It also set out the requirement that Vogel was to increase sales activity to capture new contacts and new opportunities by, *inter alia*, establishing a schedule and conducting an average of eight to ten customer meetings per week.  [*Id.* at ¶69].

As of December 14, 2010, the end of the PIP period, Vogel still had not made any sales toward his $5 million quota.  [Dkt. 36, CA 56(a)1 Stmt. ¶70].  In addition, his performance deteriorated rather than improved.  Vogel's pipeline had decreased by 75%, from $1.7 million in value, when Perlman began the performance management process, to $447,000.  [*Id.* at ¶70].  In comparison, Vogel's white colleagues who were not of Indian descent had made sales.  Mr. Johnson had made $3,111,842 in sales; Mr. DeSilva made $389,335 in sales; and Mr. Brill and Mr. Sahni made $1,038,954 in sales.  [*Id.* at ¶71].

Vogel contends that his sales goals were unattainable and that Perlman understood, citing again to the portion of his deposition testimony stating that he did not think that "some of the things in the [performance plan] were achievable," to which "they said they understand that this is not achievable, but it's based on best effort and Steve will be the determining factor of whether you've given enough effort to do this particular job." [Dkt. 39-2, P's 56(a)2 Stmt. disputed issue ¶5; Dkt. 39-3, Vogel Depo. 143:10-17]. This testimony is entirely unclear as to with whom Mr. Vogel was conversing, when, and as to which performance plan the conversation referred.

Perlman made the decision to terminate the Plaintiff's employment and, on December 20, 2010, notified Vogel of this decision and of the decision to pay Vogel through December 31, 2010. [Dkt. 36, CA 56(a)1 Stmt. ¶¶72-73]. Perlman drafted a Termination Memo to Vogel's personnel file on December 20, 2010, explaining that Vogel's termination was a result of his failure to meet the PIP performance requirements and significantly improve his performance within the sixty-day PIP period, and failure to make sales. [*Id.* at ¶74; Dkt. 35-4, Termination Memo. p.5/5].

Perlman recommended, and CA hired, Raymond Cadden, an internal CA applicant who is Caucasian and non-Indian, to replace Vogel as Account Director working with TM/MS. [Dkt. 36, CA 56(a)1 Stmt. ¶¶75-76]. When Account Director Blain Johnson transferred off of Perlman's team after Vogel had also left, Perlman hired another Caucasian, non-Indian man to replace him. [Dkt. 36, CA 56(a)1 Stmt. ¶78].

Vogel maintains that summary judgment is inappropriate because significant questions of material fact remain as to whether his job duties changed due to his race and/or national origin and whether he was terminated not due to his sales performance, but because of his race and/or national origin and because Perlman was retaliating against him for making a complaint to CA's Human Resources Department.  Vogel has identified two comments underlying his claim of race and/or national origin discrimination.  First, Plaintiff testified that, apparently before he began working for the India Service Provider team,

> When I first talked to Dennis Kozak, he described the way he wanted to build the [India Service Provider] team, having a separate India team because he felt that Indians would rather deal with Indians.  So he wanted to have an Indian contingent and a US contingent.  Those two sales divisions report to one sales executive here.

[Dkt. 39-2, P's 56(a)2 Stmt. Disputed Fact ¶1; dkt. 39-3, Vogel Depo. 82:15-20, ecf 18/62].  Second, Vogel testified that, after he began working for Steven Perlman, Perlman told Vogel that he did not "work and play well with the guys in India." [Dkt. 39-2, P's 56(a)2 Stmt. Disputed Fact ¶2; dkt. 39-3, Vogel Depo. 64:19-20, ecf 10/62].

He also alleges that the strategic portion of his job was diminished based on his race and/or national origin, or because he had previously lodged a complaint with human resources.  He testified that Perlman "moved responsibility from things that were initially on my plate to others" partially because "they would rather have Indians dealing with Indians in the sales capacity."  [Dkt. 39-3, Vogel Depo. 173:5-12].  Vogel has not provided any support for the statement that

Perlman preferred to have Indians working with other Indians on sales other than his own deposition testimony.  Vogel also testified that two of his India-based team members were having meetings with TM/MS executives to which he was not apprised or invited, but has not cited to any evidence in the record demonstrating that Perlman was responsible for Vogel's absence from the meetings or that the India-based team members were either acting under Perlman's orders or that they had any discriminatory animus.  [Dkt. 39-3, Vogel Depo. 173:5-12].

Vogel testified that Perlman's hostility toward him began after Vogel complained to Human Resources "the first time," "[a]nd then it got progressively worse from that day to when I was terminated."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶74; dkt. 39-3, Vogel Depo. 211:4 – 212:7].  He further attested that "from the first HR event to my termination was when the hostility [from Perlman] started to get out of control. . . . [E]very bit of my performance was scrutinized at a level that was beyond what he would do with anybody else ..."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶74; dkt. 39-3, Vogel Depo. 179:17 – 180:7].  Vogel has not explained the basis of his knowledge as to how Perlman treated the other Account Directors or India team members.  Moreover, Vogel has attested that Perlman gave him back his strategic job responsibilities after he complained to human resources but, a few weeks later, "they gave me a new job description taking the same exact responsibility that he took away and gave back away for good with a new job description."  [Dkt. 39-3, Vogel Depo. 127:2-9].  In his response to Defendant CA's interrogatory regarding admissions, Vogel responded that Perlman admitted during a telephone conference around February 2010 at which Perlman's "entire team"

was present that he "removed my strategic responsibility after I spoke with HR the first time.  He then had to have a community call in which he stated he was giving me the responsibility back, but then he removed it again."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶74; dkt. 39-4, Interrogatory 12 Response, ecf p.14/66].  He also testified that, during a meeting with Perlman and a human resources executive to discuss the implementation of Vogel's performance improvement measures, Perlman "brought up in this meeting that he didn't want me on his team. . . . He said I don't want him on my team.  He's not doing well."  [Dkt. 39-2, P's 56(a)2 Stmt. ¶74; dkt. 39-3, Vogel Depo. 143].

Plaintiff also maintains – and the Defendant disagrees – that Perlman retaliated against him for making the complaint to Human Resources by subsequently setting him up to fail by giving him goals even Perlman believed to be unachievable.  Vogel cites to his deposition testimony that

> even in my conversation with Karen Mangione on my exit, when they put me on a performance plan, they knew these numbers were unachievable. And Karen even went on in the final performance plan meeting, the one that we had in New York City, to say that they knew that this was unachievable and that my continued employment would be determined based on best effort which would be determined by Steve after he had said in the past that he wanted me removed from his team and was acting in a hostile way to me throughout my employment from this performance review to the point in which I was terminated.

[Dkt. 39-2, P's 56(a)2 Stmt. disputed issue ¶5; Dkt. 39-3, Vogel Depo. 118:9-20]. The Plaintiff has not included any testimony or affidavit from Ms. Mangione or anyone else tending to establish that Perlman believed the goals set for Vogel

were unachievable, and has not clarified to whom the term "they" referred. Vogel

testified in his deposition that, during one of the meetings to discuss his

performance plan he stated that he thought some of the things in the

[performance plan] were achievable and that a person whom he fails to identify

said they understood that they were not achievable, but that the assessment of

his performance would be based on best effort and Steve will be the determining

factor of whether he had made a sufficient effort to do this particular job. [Dkt. 39-

2, P's 56(a)2 Stmt. disputed issue ¶5; Dkt. 39-3, Vogel Depo. 143:10-17]. Thus,

Vogel acknowledges that his performance would not be measured by his

achievement of the sales goal alone, but also by his efforts toward achieving the

goal.

Vogel attempts to buttress his claims with other statements which he

attributes to third parties, but he does not offer support with affidavits or other

admissible evidence. He testified that several CA employees had notified him that

Perlman did not want Vogel "on his team after the first HR event." [Dkt. 39-2, P's

56(a)2 Stmt. ¶74; dkt. 39-3, Vogel Depo. 81:1-10]. Vogel also attested that an India-

based team member "told me that he was instructed by Steve to take some of

[Vogel's strategic responsibilities] away and run with them," thus moving Vogel's

strategic role to his counterparts in India. [Dkt. 39-3, Vogel Depo. 78:2-17]. Vogel

testified that the executives from TM/MS in India reported to him that they were

receiving information from Perlman that conflicted with information from Vogel,

and that these same executives told Vogel that Perlman had "bad mouthed" him.

[Dkt. 39-3, Vogel Depo. 79-80]. Vogel has not supported any of these assertions

**19**

with an affidavit or other admissible evidence from the person who allegedly made the statement to him. Finally, Vogel does not contend when Perlman allegedly made these statements, much less what, if any, reason Perlman gave for making them. Therefore, Vogel has offered no evidence tending to establish that any of the statements, if made, were made because of Vogel's race or ethnicity, as opposed to Perlman's reaction to Vogel's reticence to accept the position, Vogel's poor sales performance, or Perlman's perception of Vogel's communications skills.

## III.   Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013), citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

IV.   <u>Analysis</u>

a.   <u>Title VII Race and National Origin Discrimination</u>

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire any individual or to discharge any individual … because

of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §

2000e-2(a)(1).  Race and national origin discrimination claims under Title VII of the

Civil Rights Act of 1964 are analyzed under the three-step burden-shifting

framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Men of*

*Color Helping All Soc., Inc. v. City of Buffalo*, 529 F. App'x 20, 26 (2d Cir. 2013);

*Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  Under this framework,

a plaintiff establishes a *prima facie* case of intentional discrimination by showing

that "(1) he is a member of a protected class; (2) he was qualified for the position

he held; (3) he suffered an adverse employment action; and (4) the adverse action

took place under circumstances giving rise to the inference of discrimination."

*Ruiz*, 609 F.3d at 492.  The burden upon the plaintiff to prove a *prima facie* case is

minimal.  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir.

2001).  *See also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We

have characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'").

However, "[a] plaintiff cannot establish a prima facie case based on 'purely

conclusory allegations of discrimination, absent any concrete particulars.'"

*Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011) (quoting

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

"If the plaintiff establishes a *prima facie* case of discrimination, the burden

shifts to the employer to come forward with a legitimate, nondiscriminatory

reason for the adverse employment action.  If the employer does so, the burden

then returns to the plaintiff to demonstrate that race was the real reason for the

employer's adverse action."  *Men of Color Helping All Soc., Inc.*, 529 F. App'x at

26 (quoting *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012). "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). In sum, "[t]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citation omitted). "Importantly, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reynolds*, 685 F.3d at 202 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The Defendant argues that summary judgment must be granted in its favor on Plaintiff's race and national origin discrimination claims because Vogel has failed to make out a *prima facie* case of discrimination based on his race or national origin and because, even if he has made out a *prima facie* case, he cannot demonstrate that CA's legitimate, nondiscriminatory reason for terminating his employment, namely that he made no commissionable sales, was a pretext for discrimination.

### i.  Plaintiff's *Prima Facie* Case of Race and National Origin Discrimination

The parties do not dispute that Vogel has made out the first three elements of his *prima facie* case as to the termination of his employment: that he is a member of a protected class, that he was qualified for the Account Director position he held, and that he suffered an adverse employment action in his termination.  The parties dispute, though, whether Vogel's termination took place under circumstances giving rise to the inference of discrimination.[5]  As to Vogel's claim that the change in his job duties was a result of race and national origin discrimination, CA argues that a change in Vogel's job description does not constitute an adverse employment action for purposes of his *prima facie* case, and that the shift in the focus of his job did not occur under circumstances giving rise to an inference of discrimination.

### 1.  Inference of Discrimination

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: ... 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.' "  ***Ragin v. E. Ramapo Cent. Sch. Dist.*,**

---

[5] **The Court notes that the Plaintiff has not addressed this issue in the argument section of his opposition, but rather, noted in his fact section that his termination arose under circumstances giving rise to an inference of discrimination.**

417 F. App'x 81, 82 (2d Cir. 2011) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) and *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). It has long been recognized that "actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus" may "give rise to an inference of discriminatory motive." *See Chertkova,* 92 F.3d at 9(citing *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992)).

CA contends that no inference of discrimination can be drawn because (1) the two remarks made by Steven Perlman and Dennis Kozak and on which Vogel's claims rest constitute stray remarks not connected with any discriminatory intent, (2) Steven Perlman, Vogel's supervisor, is in the same protected class as the Plaintiff, (3) four of the five other members of the India Service Provider team in the United States, who had the same job responsibilities as Vogel, were white and non-Indian and did not complain of discriminatory conduct, nor was Vogel treated differently than any of the other five employees or those based in India; and (4) Perlman replaced Vogel with a white, non-Indian employee.  Vogel contends that the totality of the circumstances indicate discriminatory intent.

Vogel's claims of race and national origin discrimination are founded in two comments which, when viewed along with other circumstances of Vogel's employment, Vogel asserts demonstrate discriminatory intent.  Dennis Kozak, the found of the India Service Provider team, uttered the first comment.  Vogel testified that

> When I first talked to Dennis Kozak, he described the way he
> wanted to build the [India Service Provider] team, having a
> separate India team because he felt that Indians would rather
> deal with Indians.  So he wanted to have an Indian contingent
> and a US contingent.  Those two sales divisions report to one
> sales executive here.

[Dkt. 39-2, P's 56(a)2 Stmt. Disputed Fact ¶1; dkt. 39-3, Vogel Depo. 82:15-20, ecf

18/62].  Second, Vogel testified that, after he began working for Steven Perlman,

Perlman told Vogel that he did not "work and play well with the guys in India."

[Dkt. 39-2, P's 56(a)2 Stmt. Disputed Fact ¶2; dkt. 39-3, Vogel Depo. 64:19-20, ecf

10/62].  Neither of these comments, however, demonstrates discriminatory intent

either independently or viewed in the context of Vogel's employment as a whole.

"Verbal comments constitute evidence of discriminatory motivation when a

plaintiff demonstrates that a nexus exists between the allegedly discriminatory

statements and a defendant's decision to discharge the plaintiff."  *Silver v. N.*

*Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007).  "Often, however, an

employer will argue that a purportedly discriminatory comment is a mere 'stray

remark' that does not constitute evidence of discrimination."  *Id.*  "Although

courts have often used the term 'stray remark' to refer to comments that do not

evince a discriminatory motive, the Second Circuit has found that the term 'stray

remark' 'represented an attempt - perhaps by oversimplified generalization - to

explain that the more remote and oblique the remarks are in relation to the

employer's adverse action, the less they prove that the action was motivated by

discrimination.' "  *Galimore v. City Univ. of New York Bronx Cmty. College*, 641 F.

Supp. 2d 269, 284 (S.D.N.Y. 2009) (quoting *Tomassi v. Insignia Fin. Group, Inc.*,

478 F.3d 111, 115 (2d Cir. 2007)).

26

"Accordingly, the task is not to categorize remarks 'either as stray or not stray,' and 'disregard [remarks] if they fall into the stray category,' but rather to assess the remarks' 'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.' " *Id.* (citation omitted). Courts have found the following factors relevant to such a determination: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made, i.e. (whether it was related to the decision-making process)." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *Silver*, 490 F. Supp. 2d at 363 (same). "In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." *Almonord v. Kingsbrook Jewish Med. Ctr.*, No.04–CV–4071(NGG), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d. Cir. 1998)).

Moreover, it is well established that "[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." *Danzer*, 151 F.3d at 56; *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"). "[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the

27

decision-maker was motivated by the discriminatory sentiment expressed in the remark."  *Johnson v. C. White & Son, Inc.*, 772 F. Supp. 2d 408, 414 (D. Conn. 2011) (quoting *Tomassi*, 478 F.3d at 115).  *See also Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (internal quotation marks and citation omitted).  "When, however …, other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."  *Danzer*, 151 F.3d at 56.

Here, a reasonable juror could not find Kozak's alleged statement that he felt that Indians would rather deal with Indians to be discriminatory in the context of Vogel's claims.  First, no evidence in the record demonstrates that Kozak was the Plaintiff's supervisor at the time he was terminated or at the time Perlman allegedly changed his job duties.  Further, the evidence shows, and Vogel admits, that Kozak did not make the decision to terminate him.  Although the Plaintiff contends that Dennis Kozak "was involved in the decision to terminate Plaintiff," Vogel cites only to the testimony of Steven Perlman, who attested as follows:

> Q. So am I correct that you had the authority to recommend that Mr. Vogel's employment be terminated, but that you didn't actually have the final say, if you will?
>
> A. It was my recommendation and I did have the final say.
>
> Q. Okay.  In other words, did Mr. Kozak have to approve or agree with your recommendation in order for Mr. Vogel's termination to go through or –

> **A.** I spoke with him and received his guidance and he was in agreement with my recommendation.

[Dkt. 39-4, Vogel Depo. 14:8-21, ECF p. 58]. Thus, Perlman unilaterally made the decision to terminate Vogel and informed Kozak of his decision.  The fact that Kozak did not dissuade Perlman does not make him the decisionmaker.

In addition, when asked to list all of the CA employees who Vogel believed to have discriminated against him on the basis of his race, Vogel attested that Kozak was not one of them.  In his deposition he testified that it was:

> **A.** Steve Perlman.
>
> **Q.** He's the only one?
>
> **A.** He is the one who was making the decisions.

[Dkt. 33-2, Vogel Depo, 175:16-18].  The Plaintiff has thus adduced no evidence that Mr. Kozak was the final decision-maker as to the alleged change in his job duties or as to his termination.  Rather, the only evidence in the record indicates that while Perlman spoke to Kozak about Vogel, Perlman, and not Kozak, made the decisions to terminate Vogel's employment and to change his responsibilities.  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark").

Second, Kozak allegedly uttered this remark more than fourteen months prior to Vogel's termination, several months before Perlman allegedly reduced

Vogel's job duties, and seemingly before Vogel accepted the Account Director position.  Vogel testified that he spoke with Dennis Kozak, who initially managed the India Service Provider team, about the Account Director position *before* he accepted the position.[6]  He also testified, that "[w]hen I first talked to Dennis Kozak, he described the way he wanted to build the [India Service Provider] team, having a separate India team because he felt that Indians would rather deal with Indians."  Thus, pursuant to Vogel's own testimony, Kozak allegedly spoke about his belief that Indians would rather deal with Indians *before* Vogel was offered and accepted the position as Account Director on this very team headed by Kozak, who both hired Vogel and the three other white, non-Indian Account Directors (plus one non-white junior account manager) and uttered the remark. Moreover, Vogel joined the India Service Provider team in early October 2009, and Steven Perlman took over full-time management of the team in January 2010. Vogel's employment was terminated on December 20, 2010, more than fourteen months after Kozak uttered the remark.  The timing of Kozak's alleged remark therefore does not tend to show that a decision-maker (in this case, Steven Perlman) was motivated by assumptions or attitudes relating to the protected class, nor has Vogel demonstrated that it was uttered in the context of the

---

[6]  Q:  … So if you started working on this team in October or November of 2009, the conversation you described with Dennis [Kozak] and the conversation you described with Steve [Perlman] happened right around that same time period.  Is that fair to say?
A:  Yes.
Q:  Okay.  So you had a conversation with Dennis before taking the job where he told you – he described the job one way.  Is that your testimony?
A:  Yes.
[Dkt. 33-2, Vogel Depo. 49:2-12].

decision-making process relating to the adverse employment actions of which Vogel complains.  *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.").

Nor has Vogel demonstrated that the content of the remark was discriminatory in nature.  Kozak's alleged statement is not indicative of racial animus. The statement is not derogatory or disparaging of Caucasians, nor is it a statement of Kozak's personal beliefs.  Moreover, Kozak's perception that certain people in India preferred to work with other people of Indian descent did not deter him from appointing or allowing others to appoint Caucasians to head the multinational sales teams.

The parties agree that Dennis Kozak initially staffed the India Service Provider team by a multicultural pairing of four U.S.-based Account Directors, including Vogel and three other white, non-Indian men, with India-based CA counterparts and by matching a U.S.-based team with an India-based team.  The team was formed based on CA's desire to more effectively collaborate with the six largest India-based software service providers with whom CA partnered to sell software solutions.  The parties also agree that the six software service providers serviced by the India Service Provider team – including TM/MS, with whom Vogel worked – are headquartered in India.  There is no indication in the record that Kozak's alleged remark was tinged with discriminatory bias based on race or national origin as opposed to being geographic in nature.  As the India Service

Provider team was created specifically to build relations and business opportunities with companies located in India, Kozak's comment indicated his belief that the optimal structure was to have the Indian companies interact with CA representatives located in India, who could better bridge the linguistic and cultural divide and effectuate better communications and rapport with the Caucasian Sales Directors in the United States.  Indeed, Vogel's own testimony supports this view, as he specifically attested that "[w]hen I first talked to Dennis Kozak, he described the way he wanted to build the [India Service Provider] team, having a separate India team because he felt that Indians would rather deal with Indians.  *So he wanted to have an Indian contingent and a US contingent.*"  The neutrality of the comment is buttressed by the fact that Vogel chose to join the team after he heard Kozak make the remark he now relies upon.  Vogel's decision to join the team indicates that he did not find Kozak's comment to have been discriminatory at the time it was made. Consequently, this facially non-discriminatory and temporally distant remark, uttered prior to Vogel's joining the team and by a CA employee who did not make the decision to change Vogel's job duties or terminate his employment, constitutes a stray remark that does not tend to show that a decision-maker was motivated by assumptions or attitudes relating to the protected class.

Steven Perlman's statement that Vogel did not "work and play well with the guys in India" also fails to reasonably demonstrate that any adverse employment action took place under circumstances giving rise to an inference of discrimination.  As noted earlier, the parties agree that the four U.S.-based

Account Directors were each paired with India-based counterparts whose teams worked together to provide software solutions to an India-based service provider. Perlman held weekly calls with Vogel and the TM/MS team based in India.  Vogel has admitted that during some of these calls Perlman heard him speak in a dismissive, condescending, and often combative manner to the team members in India.  As Plaintiff testified at his deposition:

> Q.  Okay.  And what was your understanding of Steve [Perlman]'s meaning when he said you don't work and play well with the guys in India?
>
> A.  He pointed out that I need to be more forthcoming in the activities that we're doing here in the United States.  To educate the India team on those activities.  Continue to do the work for them to summarize and give to the Indian executives of Tech Mahindra and later Mahindra Satyam.
>
> Q.  Did Steve ever talk to you about the nature of your interactions with the Indian team and whether they were professional?
>
> A.  Steve continually told me that I was unprofessional, although some of those meetings ended in heated discussion.
>
> Q.  Okay.  And when you say some of those meetings ended in heated discussion, would you engage in heated discussion with the Indian team?
>
> A.  All four participants were engaged in heated discussion.
>
> …
>
> Q.  Okay.  Would you raise your voice in those discussions with the Indian team?
>
> A.  Yes.

[Dkt. 33-2, Vogel Depo. 64:23 – 65:23].

Perlman testified similarly:

> Q.  Did you ever tell Mr. Vogel that Mr. Vogel did not work and play well with the guys in India?
>
> A.  I don't know if I said those exact words, but I did say in that context, yes.
>
> Q.  Can you tell me, to the best of your memory, what you said to Mr. Vogel?
>
> A.  . . . [W]e had weekly team calls, and very often on those calls Howard [Vogel] was dismissive, spoke down and was combative with the Indian [team] … [A]s part of my management responsibilities, I coached Howard that he needed to work better with them to be successful.

[Dkt. 33-3, Perlman Depo. 24:22 – 26:7].  Vogel has also admitted that Perlman counseled him that he needed to interact with and work in a more professional manner with the team in India.

Perlman's statement was factual and in no way racially disparaging or indicative of racial animus. Given Plaintiff's admissions that he raised his voice to the India team members on weekly team calls during which Perlman was present, his admission that Perlman heard him speak in a dismissive, condescending, and often combative manner to the team members in India on these calls, and his admission that Perlman counseled him that he needed to interact with the India team more professionally, no reasonable juror could view Perlman's remark that Vogel did not "play well with the guys in India" to be discriminatory or that the context in which the remark was made was discriminatory.

Vogel contends that Steven Perlman's actions, when viewed in combination with these two comments, support Plaintiff's *prima facie* case of discrimination.  Specifically, Vogel alleges that Perlman moved the strategic portion of his job to the India team partially because "they would rather have

Indians dealing with Indians in the sales capacity."  [Dkt. 39-3, Vogel Depo. 173:5-12].  However, the Plaintiff has not provided any support for the statement that Perlman preferred to have Indians working with other Indians on sales, other than his own deposition testimony.  Vogel also contends that the India team's performance of some of the strategic portion of his job demonstrates discrimination.  Vogel testified that, before making his complaint to Human Resources in February 2010, "[Perlman] kept telling me that the strategic component [of the Account Director job] was still mine to do, but it would still be given to the folks in India.  So his actions were to take the two programs that I had created up until this time and completely give them to our CA India team for which I would continue to do work on under their direction, but no longer be affiliated with."  [Dkt. 39-3, Vogel Depo. 75:20 – 76:2].  Vogel has not explained how, where he as the Account Director was required to work with a counterpart in India on a team to build business with an Indian corporation and where the strategic component of his job was still his to do, sharing responsibilities with his counterpart in India constitutes unlawful racial or national origin discrimination. Moreover, although he claims in his opposition brief that the India team was claiming his work as its own, Vogel has provided no support for this assertion. Lastly, Vogel attested at his deposition that another CA employee, presumably a member of the India team, although unidentified by the Plaintiff, "told me that he was instructed by Steve to take some of these things [strategic components] away and run with them."  [Dkt. 39-3, Vogel Depo. 78:11-17].  Vogel has not provided an affidavit from the employee who allegedly made this statement and

thus Plaintiff's recall of the employee's statement to him regarding an out of court remark from Steven Perlman constitutes inadmissible hearsay that this Court may not consider upon a motion for summary judgment.  Local R. Civ. P. 56(a)3 ("Each statement of material fact … by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial").

Further, transferring of Vogel's strategic duties does not tend to strengthen the argument that Perlman discriminated against him.  First, if Perlman wanted India-based team members to deal with the Indian companies, he would have transferred the sales functions and the corresponding commissions to the India-based team members, rather than the strategic duties. Second, considering Vogel's persistent underperformance in sales, transferring the strategic duties to other team members freed up and thereby better enabled Vogel to focus on achieving his sales goals. No reasonable jury could find that the transfer of Vogel's strategic duties under the facts then existing give rise to an inference of discrimination.

Lastly, Vogel testified that two of his India-based team members were having meetings with TM/MS executives to which he was not apprised or invited, but has not cited to any evidence in the record demonstrating that Perlman was responsible for the omission or that the India-based team members were either acting under Perlman's orders or that they had any discriminatory animus.  [Dkt.

36

39-3, Vogel Depo. 173:5-12; 63:10-22].  Vogel has also cited to his Exhibit 8, which contains several unexplained emails and an Executive Profile Meeting Request Form, none of which the Plaintiff has explained, and which do not demonstrate that Vogel was intentionally left out of meetings at Perlman's direction or that Perlman failed to apprise him of the meetings.  [Dkt. 39-4, Exh. 8, ECF pp. 42-51].

      An inference against a finding of discrimination exists in this case for the additional reasons that Steven Perlman replaced Vogel with another white, non-Indian male after Vogel's termination and because Vogel has adduced no evidence that he was treated differently than any of his co-workers.  The parties agree that all four of CA's U.S.-based Account Directors, including Vogel, were white and non-Indian, that the one Junior Account Director on the U.S. team was Indian, and that each reported to Steven Perlman.  Vogel has also testified that he and the three other white, non-Indian Account Directors and the Indian Junior Account Director performed identical jobs for different Indian companies with whom CA partnered.  [Dkt. 43-1, Vogel Depo. 54:23 – 55:2].  Although the Plaintiff has had the opportunity to conduct full discovery, including taking depositions and acquiring affidavits, Vogel has proffered no evidence that he was treated differently from any of his white, non-Indian U.S.-based counterparts, from the U.S.-based Indian junior account manager, or from any member of the India-based team (whose members Vogel does not even identify and whose duties he does not explain).  At this stage in the litigation, Vogel is obligated to present *minimal* admissible evidence supporting an inference of discrimination, but he has failed to do even that.  "A plaintiff cannot establish a prima facie case based

on 'purely conclusory allegations of discrimination, absent any concrete particulars.'" *Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  Here, Vogel has offered only conclusions that he was treated differently.  No reasonable juror could conclude that Vogel was treated less favorably than his non-white, Indian counterparts and thus make the inference of discriminatory intent, as Vogel has offered no evidence to support this assertion.  *See Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

Moreover, after Vogel's termination, Perlman recommended and CA hired Raymond Cadden, an internal CA applicant who is Caucasian and non-Indian, to replace Vogel as the Account Director working with TM/MS.  Further, when white, non-Indian Account Director Blain Johnson transferred off of Perlman's team after Vogel had left, Perlman hired another Caucasian, non-Indian man to replace him.  If Perlman were indeed motivated by animus against non-Indians in sales positions, he is not likely to have recommended the hiring of a white, non-Indian to replace Vogel or, for that matter, Johnson.  This circumstance militates against a finding of discriminatory animus.  *See, e.g., White v. Pacifica Found.*, 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) ("The fact that Plaintiff was replaced by a member of the same protected class further undermines any inference of discriminatory intent.") (collecting cases); *Pearson v. Lynch*, 10 CIV. 5119 RJS, 2012 WL 983546 (S.D.N.Y. Mar. 22, 2012) ("An inference of discriminatory intent

does not exist when the plaintiff and his or her replacement are of the same protected category."); *Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) aff'd, 57 F. App'x 27 (2d Cir. 2003) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination."); *Garrow v. Economos Properties, Inc.*, 406 F. Supp. 2d 635, 640 (E.D. Va. 2005) aff'd, 242 F. App'x 68 (4th Cir. 2007) ("It is not [Title VII employment] discrimination to replace a member of a protected class with another member of the same protected class.").

The Court notes that the Defendant argues that no inference of discrimination can be drawn for the further reason that Steven Perlman identifies with the same race and national origin as does the Plaintiff.  *See, e.g., Giordano v. Gerber Scientific Products, Inc.*, 3:99CV00712(EBB), 2000 WL 1838337, at *7 (D. Conn. Nov. 14, 2000) aff'd, 24 F. App'x 79 (2d Cir. 2001) (in ADEA cases, "[w]here the decision-makers are also in the protected age group an inference may be drawn that there is no age-based animus"); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) ("Although [t]he Supreme Court has rejected any conclusive presumption that an employer or, presumably, his agents, will not discriminate against members of their own race or gender[,] … the fact that both [plaintiff] and [decision-maker] are African–American undermines any possible inference of discriminatory animus."); *Drummond v. IPC Intern., Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) ("[I]f a decision maker is in same protected class as plaintiff, claims of discrimination become less plausible."); *Hasemann v. United Parcel Serv. of Am., Inc.*, 3:11-CV-554 VLB, 2013 WL 696424, *8 (D. Conn. Feb. 26,

2013) (recognizing same).  However, even though the Plaintiff has neither addressed this argument nor contradicted CA's assertion that Perlman is white and non-Indian, the Defendant has presented no record evidence of Perlman's race or national origin.  Thus, although it is likely that CA would be entitled to a base inference of no discrimination had it presented record evidence of Perlman's race and national origin, the Court has not considered this argument in concluding that no inference of discrimination can be drawn in this case.

In conclusion, even if Kozak's and Perlman's remarks betray racial or national origin bias, which they do not, and taking all inferences most favorable to the Plaintiff, nothing in the record demonstrates an indicia of discriminatory animus such that a reasonable juror could conclude that Vogel's termination or the reduction of the strategic component of his position took place under circumstances giving rise to an inference of discrimination.

### 2.  Adverse Employment Action

Because the Court finds that neither the shift in Vogel's job duties nor his termination occurred under circumstances giving rise to an inference of race or national origin discrimination, the Court need not address whether the shift in Vogel's job duties constituted an adverse employment action.  This prong will be addressed in the following section in the context of Title VII retaliation.

### b.  Title VII Retaliation

Vogel also alleges that both his termination and the change in his job duties were in retaliation for his complaint of discrimination to CA's Human

Resources department in February 2010.   The Defendant counters that Vogel's retaliation claim must fail because he cannot demonstrate a causal connection between the change in his job duties or his termination and the filing of his internal complaint.

Under Title VII, it is unlawful for an employer to discriminate against an employee because he "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  The burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802, governs retaliation claims under Title VII. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).   To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) that the defendant took adverse employment action against the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Id.* at 125; *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). The Supreme Court has recently held that "[t]itle VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  Thus, the establishment of a causal connection between the protected activity and the adverse action "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 2533.  "Once a prima facie case of retaliation is established, the

burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa*, 708 F.3d at 125 (internal quotation marks and citations omitted).

The parties do not dispute that Vogel's filing of the internal complaint with Human Resources in February 2010 constituted participation in a protected activity sufficient to satisfy the first prong of his *prima facie* case.

### i.   Plaintiff's Prima Facie Case of Retaliation

#### 1.   Change in Job Duties as an Adverse Employment Action

Vogel cannot make out a *prima facie* case of retaliation as to his change in job duties because he has neither provided sufficient evidence that any shift in his duties constituted an adverse employment action nor demonstrated that his filing of the internal complaint in February 2010 was the but-for cause of the change in his job duties.

An adverse employment action is a "materially adverse *change* in the terms and conditions of employment."  *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

> material loss of benefits, significantly diminished material
> responsibilities, or other indices unique to a particular
> situation.

*Id.*

Here, Vogel has not presented competent evidence that the reduction of his strategic responsibilities was more disruptive than "an alteration of job responsibilities" and rises to the level of "significantly diminished material responsibilities."  Vogel testified that Perlman had changed his role from "roughly seventy percent building the strategy and thirty percent selling" to "zero percent strategy and a hundred percent sales."  [Dkt. 39-3, Vogel Depo. 125:19 – 126:4].  However, the parties both agree that Vogel's employment was at all times at-will and that the primary responsibilities of each of the four Account Directors who comprised the India Service Provider team, including Vogel, were to: (1) enter into transactions where the service provider facilitates a customer purchase of a CA product for the customer's own internal use; (2) sell to the service provider for the service provider's own internal use; and (3) enter into transactions where the service provider purchases, implements, and manages the CA product as part of a unique managed service or solution provided to one or more of the service provider's clients.  Where Vogel's and the other Account Directors' responsibilities were each specifically sales-oriented (and, as Vogel testified, identical), and where Vogel has entirely failed to apprise the Court of what strategic responsibilities he was stripped, his conclusory statement that a redirection of his sales job constitutes an adverse employment action holds no water.  Moreover, Vogel has not asserted that the reduction in his strategic duties

negatively impacted his salary, his job title, or his benefits, and he has not explained or proffered any evidence of how, ultimately, this change in duties negatively impacted his ability to sell CA's products or meet his sales quota.   On the contrary, as noted above, the transfer of those duties would have increased his ability to make a sale and even perhaps achieve his sales goal. In sum, Vogel has simply asserted that the reduction of his strategic sales duties constitutes an adverse employment action without the requisite explanation for the Court to so conclude.  He has thus not met the third prong of his *prima facie* case of retaliation as to the change in job duties.

### 2.   Causal Connection between the Protected Activity and the Adverse Employment Actions

Even if the change in Vogel's job duties constitutes an adverse employment action for purposes of his *prima facie* case, Vogel has failed to demonstrate through competent evidence in the record that his filing of the internal complaint in February 2010 was the but-for cause of the change in his job duties or the but-for cause of his termination.

Vogel contends that a causal connection is demonstrated based on the temporal proximity of his Human Resources complaint and the incidents that followed, most of which the Plaintiff does not date.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[E]ven without direct evidence of causation, a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in

time by the adverse [employment] action.").  The parties have proffered the following competent evidence on the record, as recounted in greater detail previously: Steven Perlman took over management of the India Service Provider team in January 2010.  In the same month, Vogel told Perlman that the Account Director role was not what he had anticipated when he initially took it.  Perlman told Vogel to take some time to consider whether he wanted to continue in the Account Director role or whether he wanted to transfer to another position; Vogel did so and reported back to Perlman that he wanted to continue in the Account Director role.  The Plaintiff then made a complaint to Human Resources on or about February 2, 2010 in which he described his concern that the "strategic part of [his] role was disappearing for a straight sales role," which was not the role he had initially discussed with Perlman, and that Perlman had shifted some of the strategic role to the team members based in India.  After speaking with the Human Resources representative assigned to Vogel's complaint, both parties agree that Perlman immediately spoke with Vogel and addressed his concerns and that Vogel considered the issue closed.  Vogel testified that this conversation with Perlman focused on Perlman "disclosing on the community calls as we discussed that he would be saying that all the strategic responsibility would come back to me."  Vogel testified that a few weeks after the community call on which Perlman gave him back his strategic duties, "they gave me a new job description taking the same exact responsibility that [Perlman] took away and gave back away for good with a new job description."  [Dkt. 39-3, Vogel Depo. 127:2-9].  Vogel has not clarified on the record to whom "they" refers.

As of March 31, 2010, the end of CA's fiscal year and after six months in his role as Account Director, Vogel had not made any commissionable sales toward his $3 million sales quota.  Perlman prepared Vogel's performance evaluation in April 2010, rating Vogel's overall performance as "Partially Achieved Expected Results," and expressing concern that Vogel had failed to close any business with his India partner.

Also in April, Perlman, with Vogel's input, set Vogel's sales quota for fiscal year 2011 at $5 million.  By July 2010 Vogel still had not closed any sales that counted toward his quota.  As a result, on July 29, 2010, Perlman put Vogel on a thirty-day Pre-Performance Improvement Plan (the Pre-PIP) to provide him with written direction to detail the expectations of and set performance metrics for Vogel's Account Director role.  Perlman notified Vogel that he would be monitoring Vogel's performance over the course of the following thirty days and, if Vogel had not achieved the goals set forth in the Pre-PIP, he would be put on a formal Performance Improvement Plan.  Although the Plaintiff claims that the goals in this Pre-PIP were "unachievable," he has presented no competent evidence as to how the Pre-PIP was unachievable, how the goals set for him differed from those set for the other Account Managers or the India team, or how he made progress toward the goals set in the Pre-PIP.  Moreover, although Vogel claims that he told Perlman that he had accomplished some of the work tasks that Perlman claimed he had not accomplished in the Pre-PIP meeting in July, Vogel has not elaborated on this point in any way that would allow a jury to

conclude that the Pre-PIP was unachievable or was instituted to punish Vogel for making his HR complaint.  [Dkt. 39-1, P's Opp. to MSJ, p. 17].

Perlman met with Vogel again on August 27, 2010 to discuss his performance relative to the Pre-PIP requirements, against which Vogel had made no progress.  Vogel blamed the nature of his India partner, TM/MS, and its lack of prior relationship with CA as the reasons for his low sales.  The parties agree that Perlman chose not to put Vogel on a Performance Improvement Plan (the PIP) immediately, but instead allowed him two extra months to continue to work on the Pre-PIP goals.

As of September 2010, Vogel had failed to improve his performance and had made no sales that counted toward his quota, while the other Account Directors on the India Service Provider team had each closed sales during the same period.  As of September 17, 2010, Vogel had closed zero sales applicable to his quota, Mr. Johnson had closed over $2.5 million in sales toward his quota, Mr. DeSilva had closed $271,000 of sales, and Mr. Brill and Mr. Sahni had each closed over $575,000 in sales.  Further, Vogel's pipeline was $1,707,000, a fraction of the $15 million generally necessary to meet his $5 million quota.  A month later, in October 2010, Vogel's sales remained at zero while Johnson's, DeSilva's, Brill's, and Sahni's each increased; Johnson's to $3.3 million, DeSilva's to almost $400,000, and Brill's and Sahni's to a bit over $1 million.

On October 12, 2010 Perlman placed Vogel on a sixty-day Performance Improvement Plan.  The PIP addressed Vogel's continued failure to meet the

performance requirements of his job and set forth performance requirements and goals that Vogel was expected to meet over the next sixty days, including requiring that Vogel achieve a pro-rated portion (1/12[th]) of his quota for each month of the PIP, add at least eight new opportunities to his pipeline, and increase his sale activity by, *inter alia*, establishing a schedule and conducting an average of eight to ten customer meetings per week.  Although Vogel claims that this PIP was unachievable, he has proffered only hearsay in support; thus there is no competent evidence in the record from which a jury could conclude that the PIP was unachievable or that the PIP was instituted in retaliation for Vogel's HR complaint against Perlman.

As of December 14, 2010, the end of the PIP period, Vogel had made no sales toward his $5 million quota.  In comparison, Mr. Johnson had completed $3,111,842 in sales; Mr. DeSilva had completed $389,335 in sales; and Mr. Brill and Mr. Sahni had completed $1,038,954 in sales.  Vogel's pipeline had decreased by 75%, from $1.7 million in value when Perlman began the performance management process to $447,000, a decrease that Vogel attributes in part to the loss of a major deal.

In addition to Vogel's failure to complete any commissionable sales, the parties agree that Perlman held weekly calls with Vogel and the rest of the TM/MS team in India, during some of which Perlman heard Vogel speak in a dismissive, condescending, and often combative manner to the team members in India.  As a result, Perlman counseled Vogel that, as part of his management responsibilities,

Vogel needed to interact and work in a more professional manner with the team in India.

Vogel was terminated on December 20, 2010 due to his failure to meet the PIP performance requirements and significantly improve his performance within the sixty-day PIP period, and his failure to complete sales.

This sequence of events does not demonstrate, temporally, directly, or otherwise circumstantially, that Vogel's complaint to human resources was the but-for cause of the change in Vogel's job duties or the but-for cause of his termination.  First, the record demonstrates that the initial change in the Plaintiff's job duties occurred *before* he filed his internal complaint and that this responsibility shift prompted Vogel to lodge the complaint.  Vogel confirmed this during his deposition:

> Q.  You made a complaint – you just testified about the strategic responsibility being taken away from you?
>
> A.  Correct.
>
> Q.  So that happened before you made the complaint to HR.  Is that correct?
>
> A.  Yes.

[Dkt. 43-1, Vogel Depo. 59:11-17].  This responsibility was apparently restored to Vogel after he discussed his concerns with Perlman, but was reduced again a few weeks after this discussion by more than one person whose identities Vogel did not provide during his deposition ("they gave me a new job description taking the same exact responsibility that [Perlman] took away and gave back away for good with a new job description.").  Thus, the record does not demonstrate that

Perlman diminished Vogel's strategic role in retaliation for his bringing a complaint, but rather that Perlman had re-focused Vogel's Account Director role *prior to* Vogel's complaint, and readjusted his role again several weeks after Vogel's HR complaint.

Vogel contends that his work environment became hostile after he made his HR complaint and that Perlman never offered him assistance, although he has admitted that Perlman regularly counseled him about his sales goals.  Vogel testified that he had

> asked [Perlman] on several occasions to help me.  On several of the occasions, he just made fun of me.  He would tell me what a terrible job I was doing. . . . And I explained to him that that is not helpful.  If there are things that I am not doing in relation to selling these deals, I'm happy to do that.  And he would laugh at me.  He would tell me that I should call the other members of our team to find out what they were doing.  One time he said, you're a professional; you figure it out.  His demeanor was non-helpful.  It was actually more hurtful.  It was very hostile.

[Dkt. 39-2, P's 56(a)2 Stmt. ¶49; Dkt. 39-3, Vogel Depo. 149:14 – 150:5].  Although Vogel's testimony may indicate that Perlman demonstrated hostility toward Vogel, in the context of Vogel's failure to close any sales toward his quota and his admission that Perlman heard Vogel speak in a dismissive, condescending, and often combative manner to the team members in India, Perlman's demeanor toward and criticism of Vogel does not demonstrate, in the absence of other competent evidence in the record, that Perlman's conduct was retaliatory or discriminatory.  *See, e.g., Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 414 (S.D.N.Y. 2006) (holding that plaintiff's discrimination claim failed where she did

not proffer any direct or circumstantial evidence that her supervisor was motivated by discrimination in allegedly fostering a hostile work environment). Nor has Vogel adduced any evidence on the record that Perlman treated him differently from any other Account or Junior Account Manager, or differently from any member of CA's India-based team.

As summarized above, the competent evidence in the record also demonstrates that Vogel did not successfully fulfill his role as an Account Director, in that he completed no commissionable sales toward his sales quota in the fourteen months of his employment as an Account Director, unlike the other Account Directors who reported to Perlman.  In response to Vogel's lack of sales, he was put on a Pre-PIP, which was extended to allow him more time to accomplish its goals, and then on a PIP when he could not fulfill those job responsibilities.  Although Vogel contends that the goals in the Pre-PIP and the PIP were unachievable and that Perlman knew that the goals therein were impossible to achieve, he has not fulfilled his obligation at the summary judgment stage to proffer credible evidence in the record demonstrating that this assertion is at all credible.  Even if it is, however, Vogel does not deny that he failed to make a single commissionable sale toward his quota, while the other members of the India Service Provider team each posted gains toward their own quotas, some of which were higher than Vogel's quota, and he does not deny that he was terminated for his failure to make any commissionable sales.  The credible evidence in the record does not support an inference of retaliation where Vogel has admitted that his and each of the other Account Director positions

were focused on sales, that he failed to make any commissionable sales in fourteen months, and that each of the other Account Directors, whose duties were identical to Vogel's, made commissionable sales toward their own quotas. Vogel has likewise not adduced any evidence that the change in his job duties caused him to be unable to close any sales.  As previously discussed, Vogel testified that he and the other U.S.-based Account Directors and Junior Account Director had identical job duties.  Yet those four Account and Junior Account Directors each made increasing numbers of commissionable sales counting toward their quotas through December 14, 2010, while Vogel did not complete a single sale in the same period.  Consequently, a reasonable juror could not conclude that Vogel was unable to complete a sale because of the nature of his job duties, where each of his counterparts completed sales against their quotas under identical constraints, nor could a reasonable juror conclude based on the record evidence that Vogel's termination occurred as a result of retaliation.  *See, e.g., Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 74 (2d Cir. 2014) (holding that plaintiff's retaliation claim must fail because the plaintiff failed to offer evidence to show pretext or to create a triable issue of material fact as to whether the plaintiff's negative review and termination "would not have occurred in the absence of the alleged wrongful action or actions of the employer") (citing *Nassar*, 133 S. Ct. at 2533).

Likewise, Vogel's termination occurred a full ten months after his complaint to the Human Resources department, a span of time in which Vogel was the only U.S.-based Account Director who failed to make a single

commissionable sale toward his fiscal year sales quota; despite that each of the Account Directors were responsible for performing the same job duties and were each paired with an India-based CA team.  Vogel has not demonstrated any temporal proximity between his internal complaint and his termination.

### c. CA's Legitimate, Non-Discriminatory Reason and Plaintiff's Failure to Demonstrate Pretext

Even assuming, *arguendo*, that the Plaintiff has established a *prima facie* case of race and national origin discrimination and retaliation based upon his termination, CA has articulated a legitimate, non-discriminatory reason for terminating Vogel's employment: his utter failure to make any commissionable sales toward his quota at any point during his fourteen months on the India Service Provider team.  Vogel does not dispute that he completed no commissionable sales during his time on the team or that his pipeline was underdeveloped.  The Court thus finds that the Defendant has articulated a legitimate and nondiscriminatory reason for Vogel's termination as Account Director, namely, his weak performance.  *See, e.g., Sutherland v. New York State Dept. of Law*, No. 99–9086, 2000 WL 730413, at *3 (2d Cir. June 2, 2000) (demonstrated poor job performance is "no doubt ... a legitimate nondiscriminatory reason for ... termination."); *Bogues v. Town of Trumbull*, 383 F. Supp. 2d 348, 356 (D. Conn. 2005) ("An employer's dissatisfaction with the quality of an employee's work is a legitimate nondiscriminatory reason.").

Because CA has produced evidence that it terminated Vogel for a legitimate, nondiscriminatory reason, the burden shifts to Vogel to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination" or retaliation. *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (internal quotation marks and citation omitted); *Summa*, 708 F.3d at 125. In other words, Vogel must proffer sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that Vogel's race or national origin, or CA's desire to retaliate against Vogel for making an internal complaint, was a but-for cause of CA's decision to terminate him as an Account Director. An employer's reason "cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation marks and citation omitted); *Attard*, 451 F. App'x at 24 (quoting same).

Here, Vogel has failed to demonstrate that CA's proffered non-discriminatory and non-retaliatory reason for his termination is a mere pretext and that racial and/or national origin or retaliatory animus was the true reason for his termination. As discussed in depth previously, the record demonstrates that Vogel was the only one of five Account and Junior Account Directors who failed to make a single commissionable sale toward his quota in the fourteen months of his employment as an Account Manager, a fact that Vogel concedes, and that Vogel's pipeline was underfunded, which Vogel also concedes. Vogel also concedes that Perlman held weekly calls with Vogel and the rest of the TM/MS

54

team in India, during some of which Perlman heard Vogel speak in a dismissive, condescending, and often combative manner to the team members in India and that, as part of his management responsibilities, Perlman counseled Vogel that he needed to interact with and work in a more professional manner with the team in India.  The record further indicates that Vogel was provided with extensive guidance in the form of the Pre-PIP and the PIP, the goals in which Vogel concedes that he did not meet.  The record also demonstrates, as discussed in depth, that the allegedly discriminatory statements on which Vogel relies are nothing more than stray remarks with no discernible relation to any discriminatory animus.  Furthermore, Vogel was replaced by a white, non-Indian male employee, a member of the same racial and national origin group as the Plaintiff.

Vogel argues that CA's legitimate, nondiscriminatory reason is pretext, as demonstrated by Perlman's deliberate interference with Vogel's ability to close sales.  In support, Vogel contends that Perlman took products on which he was working and gave them to the India team, causing confusion and friction with the Indian partner.  Vogel testified that "[the India partner's] executives were coming back to me and saying they were getting conflicting information.  What I was proposing and working on them with here in the United States was not what Steve was telling and the India team was telling their executives in India.  And it caused some friction in the partner . . . they were very concerned that as a partner CA we were not giving a consistent message to their teams."  [Dkt. 39-3, Vogel Depo. 79:11-23, ECF p.15/62].  Vogel, however, has not corroborated this

testimony with any affidavit in the record from any India partner or employee and, as such, his testimony about what India executives told him about what Perlman told them is inadmissible hearsay that this Court may not consider on a motion for summary judgment.  As previously discussed, Vogel's other proffered evidence that the India team was instructed by Perlman to appropriate Vogel's strategic responsibilities is also inadmissible hearsay.[7]  Vogel's contention that Perlman "bad mouthed" him to the executives in India is also only backed by inadmissible hearsay.  Vogel testified that unnamed executives in India told him that Perlman had made comments about Vogel to the executives.  Remarks made by unidentified executives in India to Vogel, relaying remarks allegedly made by Perlman, and proffered for the truth of the matter that Perlman bad mouthed Vogel, thus demonstrating retaliatory or discriminatory animus, are a classic example of hearsay and thus irrelevant in the summary judgment context.  Vogel also contends that the record demonstrates pretext because he sold software that was never credited to him.  However, the Plaintiff concedes that these sales were not credited to him based on CA's requirement that the sales were not high enough to count toward his sales quota.

Even though Vogel has admitted that Perlman regularly counseled the Plaintiff about his sales goals, which typically involved a discussion of Plaintiff's

---

[7] Vogel attested at his deposition that another CA employee, presumably a member of the India team although undefined by the Plaintiff, "told me that he was instructed by Steve to take some of these things [strategic components] away and run with them."  [Dkt. 39-3, Vogel Depo. 78:11-17].  Vogel has not provided an affidavit from the employee who allegedly made this statement and thus, Plaintiff's recall of the employee's statement to him regarding an out of court remark from Steven Perlman constitutes inadmissible hearsay that this Court may not consider upon a motion for summary judgment.

sales pipeline, Vogel nonetheless contends that his work environment became

hostile after he made his HR complaint and that Perlman never offered him

assistance.  [Dkt. 39-1, P's Opp. to MSJ, p. 21].  Instead, Vogel testified that he

had

> asked [Perlman] on several occasions to help me.  On several
> of the occasions, he just made fun of me.  He would tell me
> what a terrible job I was doing. . . . And I explained to him that
> that is not helpful.  If there are things that I am not doing in
> relation to selling these deals, I'm happy to do that.  And he
> would laugh at me.  He would tell me that I should call the
> other members of our team to find out what they were doing.
> One time he said, you're a professional; you figure it out.  His
> demeanor was non-helpful.  It was actually more hurtful.  It
> was very hostile.

[Dkt. 39-2, P's 56(a)2 Stmt. ¶49; Dkt. 39-3, Vogel Depo. 149:14 – 150:5].  However,

although Vogel's testimony may indicate that Perlman demonstrated hostility

toward Vogel, Perlman's demeanor toward and criticism of Vogel in the context of

Vogel's failure to close any sales toward his quota and his admission that

Perlman heard Vogel speak in a dismissive, condescending, and often combative

manner to the team members in India does not demonstrate, in the absence of

other competent evidence in the record, that Perlman's conduct was retaliatory or

discriminatory.  *See, e.g., Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 414

(S.D.N.Y. 2006) (holding that plaintiff's discrimination claim failed where she did

not proffer any direct or circumstantial evidence that her supervisor was

motivated by discrimination in allegedly fostering a hostile work environment).

Nor has Vogel adduced any evidence on the record that Perlman treated him

differently from any other Account or Junior Account Manager, or differently from any member of CA's India-based team.[8]

Vogel also argues that CA's reason indicates pretext because Perlman testified that Vogel's replacement did not close any sales existing in the Plaintiff's pipeline at the time he was terminated. [Dkt. 39-1, P's Opp. p. 20]. It is unclear, however, how this fact bolsters the Plaintiff's claim of retaliation or discrimination, as the record indicates that, at the time of his termination, Vogel's pipeline was underfunded. The record does not indicate whether any viable sales opportunities existed in Vogel's pipeline at the time of his termination, and thus, the Court cannot conclude that Vogel's replacement had the benefit of any sales prospects teed up by Vogel, and on which he could subsequently close. Lastly, Vogel has not demonstrated the relevance of his assertion that "Perlman himself has been accused of racial and/or national origin discrimination in the past when he made a joke regarding another employee's accent." [Dkt. 39-1, P's Opp. to

---

[8] The Court notes that Vogel has argued that he "testified that a number of other members of Mr. Perlman's team acknowledged that Mr. Perlman treated the Plaintiff differently than everyone else." [Dkt. 39-1, P's Opp. to MSJ, p. 22]. This purported evidence, however, is inadmissible hearsay, and thus not creditable as opposition to the Defendant's summary judgment motion. The Plaintiff has proffered no affidavits, deposition testimony, or sworn testimony from any CA employee who allegedly believed that Perlman was treating Vogel differently. Vogel also testified that the Pre-PIP "was a set of requirements that were unique to me and not unique to the team. So there were others that were on our team that were not required to do anything similar to what was being asked of me here." [Dkt. 39-1, P's Opp. to MSJ, pp.17-18; dkt. 39-3, Vogel Depo. 145:1-5]. Vogel further attested that he ascertained this information after asking "some of the other members of our team if their component of what they were doing was similar to what I had outlined here [in the Pre-PIP]." [Dkt. 39-3, Vogel Depo. 145:6-24]. Although Vogel attested to the identities of the employees with whom he spoke, he has proffered no evidence other than his own testimony as to their statements and has not elaborated as to how his requirements differed from those of these other employees.

MSJ, p. 20].  Vogel has not identified the employee, provided any details as to the disposition of the employee's claim against Perlman, or even the temporal proximity of the alleged remark in relation to the issues in this case, nor has he demonstrated that the complaint was indicative of racial animus against Caucasian Americans.  As such, the Court cannot conclude that this information is relevant absent any further evidence in the record.

In sum, the collective effect of the Plaintiff's evidence does not demonstrate that CA's legitimate nondiscriminatory and nonretaliatory reason for his termination was false and that CA's true reason for his termination was illegal racial or national origin discrimination or retaliation for making an internal complaint.  Vogel's disagreement with CA over whether his performance was up to CA's standards does not demonstrate that CA's stated reason for terminating him was not its true reason.  "Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual."  *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010).  CA's decision to terminate Vogel's employment is not so implausible as to call into question its genuineness such that a reasonable trier of fact could find that CA's reason was pretextual.  As such, Vogel has failed to rebut CA's reason for his termination and summary judgment in favor of Defendant CA as to Vogel's federal claims is appropriate.

### d. <u>State Law Claims</u>

Having granted summary judgment as to the federal law claims against the Defendant, the Court declines to exercise its supplemental jurisdiction over the Plaintiff's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case."  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction."  *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Because the Court has granted summary judgment for Defendant CA on Plaintiff's Title VII claims, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Vogel's remaining claims for violations of Connecticut's Fair Employment Practices Act.  *See Zito v. Fried,*

*Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims.  If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).

V.   **Conclusion**

     For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  The Clerk is directed to enter judgment in favor of Defendant CA and to close the case.

                                        **IT IS SO ORDERED.**


                              _____/s/_____
                              **Hon. Vanessa L. Bryant**
                              **United States District Judge**

**Dated at Hartford, Connecticut: September 8, 2014**